UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| JESSYKA KIRK and NICOLE ALSTON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BRIDGE IT, INC., <br><br> Defendant. | No. <br><br> **CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiffs Jessyka Kirk and Nicole Alston ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Bridge It, Inc. ("Defendant" or "Brigit"), and allege as follows:

## NATURE OF THE ACTION

1. This action concerns a cash advance product that Defendant offers in Maryland.

2. To obtain compensation for offering this product, Defendant charges fees.

3. These charges yield triple digit APRs that routinely exceed 300%.

4. That is far above the lawful rate allowed in Maryland.

5. Moreover, Defendant is not licensed to make loans in Maryland, which means that Defendant cannot even receive or retain the principal of the loans it makes, or the fees Defendant charges to Maryland residents.

6. Accordingly, Plaintiffs bring this action, on behalf of themselves and a class of all similarly situated persons, under the Maryland Consumer Loan Law ("CLL"), Truth-in-Lending Act ("TILA"), and Electronic Funds Transfer Act ("EFTA"), and Plaintiffs seek to recover all payments made to Defendant, statutory damages, and attorneys' fees and costs.

1

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d).

8. The Court has personal jurisdiction over Defendant because Plaintiffs' claims arose in this district and Defendant does substantial business in this district.

9. Venue is proper under 28 U.S.C. § 1391.

## PARTIES

10. Jessyka Kirk is a person residing in Baltimore, Maryland.

11. Nicole Alston is a person residing in Anne Arundel, Maryland.

12. Brigit is a technology company headquartered in New York, New York.

13. Brigit is not a bank and is not licensed under any Maryland statute.

14. Brigit makes loans or advances to Maryland consumers over the internet.

15. Brigit is backed by venture capitalists and experienced investors, who expect "to be paid back royally" for their investment. Tara Siegel Bernard, *Apps Will Get You Paid Early, for a Price*, N.Y. Times (Oct. 2, 2020), https://www.nytimes.com/2020/10/02/your-money/cash-advance-apps-paychecks.html.

16. Brigit investors have paid millions of dollars in hopes that Brigit can evade state law compensation caps for lending money.

17. Brigit created the cash advance product at issue here in hopes of evading state and federal law and producing a massive return for its investors.

## FACTUAL ALLEGATIONS

*Brigit's Cash Advance Product*

18. Brigit operates a lending app called "Brigit."

19. The app provides consumers with cash advances.

2

20. Brigit currently offers a standard advance and an expedited advance.

21. The former is deposited into a bank account a few days after it is requested.

22. The latter is deposited into a bank account a few minutes after it is requested.

23. Users must pay a $4.99 express fee to obtain an expedited advance.

24. Users also must pay a $9.99 monthly subscription fee to obtain any type of advance, whether standard or expedited.

25. These fees are intended to compensate Brigit for loaning money; they do not cover the cost of other services.

26. It is impossible to obtain a cash advance without linking a bank account to Brigit's app, and without authorizing Brigit to automatically deduct its monthly subscription fee from a linked bank account immediately after an employer deposits a paycheck on payday.

27. It also is impossible to obtain a cash advance without satisfying Brigit's proprietary underwriting criteria.

28. In practice, these criteria prevent most consumers from obtaining cash advances of more than $50.00 or $100.00.

29. It also prevents consumers from obtaining advances without having an employer that pays them regularly and that directly deposits paychecks into the bank account that is linked to Brigit's app.

30. Brigit will not issue more than one advance at a time, and will not issue a second advance unless the first is repaid.

31. Brigit requires its advances to be repaid on payday, and the Brigit app automatically sets repayment dates for payday.

32.     Consumers cannot obtain advances from Brigit without agreeing to allow Brigit to automatically deduct its advances from a bank account immediately after an employer deposits paychecks on payday.

33.     Brigit's underwriting criteria, the requirement that users link their bank accounts to the Brigit app, and Brigit's requirement that users authorize Brigit to deduct its advances and any fees from bank accounts on payday, has resulted in Brigit obtaining repayment on the vast majority of the advances that Brigit issues.

34.     By requiring users to repay its advances, and by requiring them to allow Brigit to automatically debit accounts for repayment of its advances and fees, Brigit can cause consumers to incur overdraft fees, or insufficient funds fees, if an account does not have sufficient funds to cover Brigit's automatic debits.

***Brigit's Cash Advance Product Is Costly***

35.     Brigit advertises its cash advance product "no interest" and "free."

36.     This claim is untrue—Brigit's cash advances have significant costs.

37.     For example, a $50.00 advance, with a two-week repayment schedule, and a $9.99 monthly fee yields a 519% APR.

38.     The same advance with a $4.99 express fee yields a 778% APR.

39.     Brigit does not disclose the APRs of its cash advances before, during, or after any transaction, which allows Brigit to mislead borrowers to believe its advances are "no interest" and "free."

40.     The APRs associated with Brigit's advances are similar to the APRs associated with payday loans. *See* California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, p. 62 (Mar. 15, 2023), *available at*, https://d

fpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2 (stating the "APRs for companies [offering advances through cash advances apps] are generally similar to the average APRs for licensed payday lenders in California"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advanc   e-apps-like-earnin-dailypay (displaying the cost of payday loans versus cash advances); Grace Gedye, *The new payday loans? California moves to regulate cash advance apps*, Cal Matters (June 5, 2023), https://calmatters.org/economy/2023/06/earned-wage-access/ (similar).

41.    The high fees associated with payday loans generally leave holes in the paychecks of borrowers, which leads to a cycle of reborrowing, where borrowers take out new loans to fill the gaps created by old loans. *See, e.g.*, Consumer Financial Protection Bureau, *Payday Loans and Deposit Advances Products*, pp. 21-22 (Apr. 24, 2013), *available at*, https://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf (finding only 13% of borrowers took 2 or less payday loans in a two month period).

42.    Cash advances apps, like Brigit, create these same holes and this same reborrowing cycle. *See, e.g.*, Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advan ce-apps-like-earnin-dailypay; (detailing cash advance app user, who "found himself trapped in a constant loop or borrowing" and felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing cash advance app user who described the app as a "vicious cycle" and "had no

money" after paying tips and fees); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/ (detailing cash advance app user who fell into a "cycle of get paid and borrow, get paid and borrow").

43.    Despite Brigit's cash advances being just as costly as payday loans, Brigit obtains repayment of its advances, along with fees that yield triple digit APRs and are intended to provide Brigit compensation for lending money, at a rate of at least 97%. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage Trends, p. 2 (April 2021), *available at*, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_ Trends_FINAL.pdf.

44.    This rate "significantly" exceeds that of payday lenders. *See* California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, pp 24-25 (Mar. 15, 2023), *available at*, https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2

45.    Despite receiving amounts that are just as costly as those charged for a payday loan, and despite receiving those costly charges on virtually every advance that it issues, Brigit, unlike payday lenders, never discloses the cost of its advances in terms of APR, before, during, or after a loan transaction.

46.    This results in consumers failing to understand the true cost of Brigit's advances. *See, e.g.,* Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-tak ing-n1034071 (discussing user unaware that cash advance app had triple digit APRs); Laurence Dermiento, *His app lends money for free. But*

*it will probably cost you*, LA Times (May 18, 2022), https://www.latimes.com/business/story/2022-05-18/dave-inc-jason-wilk-cash-advance-app (same).

***Brigit's Lending Practices Harm Maryland Consumers***

47.      Brigit's advances are no different than payday loans.

48.      Payday loans generally are "balloon" loans, which means the principal a consumer receives, along with any fee or other amount a consumer is scheduled to pay, are repaid in a single installment, generally on payday.

49.      The compensation payday lenders receive for making loans generally reaches triple digits in terms of APR.

50.      As explained above, Brigit's advances also function as "balloon" loans and Brigit similarly receives costly compensation for making advances.

51.      Brigit's advances, however, are worse than payday loans in at least two respects, both of which have been explained above.

52.      First, unlike payday lenders, Brigit deceptively brands its advances as a "free" and "no interest," and fails to inform consumers about the cost of its cash advances in terms of APR, which prevents consumers from understanding what they are paying.

53.      This also takes advantage of the general public's lack of awareness of how fees can add up.

54.      Both of these things can result in a detrimental cycle of debt, and incentivize poor money management habits.

55.      Second, unlike payday lenders, Brigit is more successful in taking its triple digit APR compensation from consumers' bank accounts, and Brigit does so at a rate of at least 97%. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage

7

Trends, p. 2 (April 2021), *available at*, https:/ /cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190 749/EWA_D2C_Advance-_sage_ Trends_FINAL.pdf.

56.     That means users of Brigit's cash advance product are far more likely to have costs that yield triple digit APRs deducted from their bank accounts than borrowers that visit traditional payday lenders.

57.     By taking tips and fees that yield triple digit APRs from user's accounts with a 97% success rate, and by failing to disclose the cost of its cash advances with a recognizable metric—like APR—Brigit is trapping many Maryland users in a detrimental "cycle of get paid and borrow, get paid and borrow." Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/.

58.     The CLL prohibits this conduct, and it caps the APRs for small dollar loans at 33%. Md. Com. Law § 12-306(a)(2)(i).

59.     Moreover, the CLL prohibits Brigit from receiving or retaining any amount on any advance, including principal and fees, because Brigit is not licensed to make loans of $25,000 or less in Maryland. Md. Com. Law § 12-314(b)(2).

60.     Federal law also prohibits Brigit's conduct: TILA requires the disclosure of the cost of Brigit's cash advance product in terms of APR so users can understand what they are paying, 15 U.S.C. § 1638(a)(4), while EFTA prohibits Brigit from conditioning the extension of a cash advance on repayment by means of a preauthorized transfer, *id.* § 1693e(a).

*Facts Relevant to Plaintiffs*

61.     Plaintiffs obtained cash advances from Brigit, and used those advances for personal, family, and/or household purposes.

62.     Plaintiffs paid Brigit's express and monthly fees, and were unable to obtain cash advances without paying these fees.

63.     Plaintiffs did not know they were paying interest by paying Brigit's fees.

64.     Brigit's fees yielded double and triple-digit APRs.

65.     Plaintiffs were unaware that the amounts they paid yielded double and triple-digit APRs, and Brigit failed to disclose this fact.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action individually and on behalf of those similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

67.     Plaintiffs seek to certify the following class: "All persons with a Maryland address, who obtained an advance or loan from Defendant."

68.     Plaintiffs reserve the right to expand, narrow, or otherwise modify the class as the litigation continues and discovery proceeds.

69.     Fed. R. Civ. P. 23(a)(1): The class is so numerous that joinder is impracticable. There are thousands of members of the class. The class is identifiable by the records of Defendant and Plaintiffs and the class members.

70.     Fed. R. Civ. P. 23(a)(2), (b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over individual issues. For example, there is a single common answer to whether Defendant's advances qualify as "loans" under the CLL or as "credit" under TILA. These question, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

71.    <u>Fed. R. Civ. P. 23(a)(3):</u> Plaintiffs' claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

72.    <u>Fed. R. Civ. P. 23(a)(4):</u> Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and the class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

73.    <u>Fed. R. Civ. P. 23(b)(3):</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

## COUNT I
### Violation of the Consumer Loan Law
### Md. Com. Law §§ 12-301, *et seq.*

74.     This claim is brought individually and on behalf of the class.

75.     The CLL applies to loans of $25,000 or less that are made for personal, family, or household purposes. Md. Com. Law § 12-303(a)(1).

76.     The advances at issue in this case are loans. Md. Com. Law §§ 12-301(e)(1).

77.     Defendant is not licensed under the CLL.

78.     Defendant is not exempt from the CLL's licensing requirement

79.     The CLL prohibits a person from engaging in the business of making loans unless the person is licensed or exempt from the licensing requirement. *Id.* § 12-302.

80.     If a person makes a loan under the CLL without a license, the loan is unenforceable and void. *Id.* § 12-314(b)(1)(i)(3).

81.     An unlicensed person may not receive or retain any principal, interest, fees, or other compensation with respect to a loan that is void or unenforceable pursuant to the MCL. *Id.* § 12-314(b)(2).

82.     Because Defendant made loans without a license, those loans are unenforceable and void, and Defendant may not retain any principle, interest, fees, or other consideration Defendant collected or received, and must return those amounts to Plaintiffs and the class.

83.     Defendant also may not collect or attempt to collect any amounts owed on any loans that are outstanding. *Id.* § 12-314(d)(1).

84.     Finally, Defendant must return any amounts it collected over the past twelve years on any loans issued in Maryland. *See Price v. Murdy*, 198 A.3d 798 (Md. App. 2018) (finding that twelve-year statute of limitations applies to CLL).

85. Accordingly, the Court should issue an order enjoining Defendant from collecting or receiving any amounts on any loan made in Maryland, requiring Defendant to repay all amounts it received on any loan made in Maryland, requiring Defendant to pay attorneys' fees and costs, and requiring all additional relief that is necessary and proper.

## COUNT II
### Violation of the Truth-In-Lending Act
### 15 U.S.C. §§ 1601, *et seq.*

86. This claim is brought individually and on behalf of the class.

87. Defendant is a "creditor," Plaintiffs' and the class's cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

88. TILA required Defendant to disclose the: "amount financed"; "finance charge"; "annual percentage rate"; and "total of payments." *Id.* §§ 1638(a)(2), (3), (4), (5).

89. The purpose of these disclosure requirements is to ensure a meaningful disclosure of credit terms to protect consumers against unfair credit practices and to ensure consumers avoid the uninformed use of credit. *Id.* § 1601(a).

90. Defendant failed to disclose, among other things, the "finance charge," "amount financed," "annual percentage rate," "total of payments," and schedule of payments to Plaintiffs and the class members.

91. Indeed, at no time before, during, or after Plaintiffs or any class member obtained a loan or advance did Defendant disclose any of the above terms.

92. Because Defendant failed to comply with TILA's requirements, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1640(a).

## COUNT III
### Violation of the Electronic Funds Transfer Act
### 15 U.S.C. §§ 1693, *et seq.*

93.     This claim is brought individually and on behalf of the class.

94.     Plaintiffs and the class members are "consumers," Defendant's cash advances are "extensions of credit," the bank accounts Plaintiffs and the class members were required to link to Defendant's app are "accounts," and the withdraws Defendant made from the accounts of Plaintiffs and the members of the class are "preauthorized electronic fund transfers" within the meaning of the EFTA. 15 U.S.C. §§ 1693a(2), (6), (10).

95.     Defendant violated EFTA by conditioning its extension of credit on repayment by means of preauthorized transfers. *Id.* § 1693e(a).

96.     Because Defendant failed to comply with EFTA's requirements, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1693m(a).

## COUNT IV
### Violation of the Consumer Protection Act
### Md. Com. Law §§ 13-101, *et seq.*

97.     This claim is brought individually and on behalf of the class.

98.     Defendant's conduct as described herein constitutes "unfair, abusive, or deceptive trade practices" under the MCPA. Md. Com. Law § 13-301.

99.     That conduct occurred in the conduct of extending consumer credit and collecting consumer debt, as prohibited by the MCPA. *Id.* § 13-303.

100.    Defendant engaged in *unfair* and *deceptive* practices by: branding its advances as a "0% Interest" and "0% APR" product, even though the product included interest that yielded triple digit APRs; and knowingly concealing and suppressing, and consciously omitting material facts

from Plaintiffs and the class members in recognition that consumers would rely on Defendant's uniform representations about its financial product.

101.    The acts and omissions resulted in a substantial injury that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces and is not the type of injury that a consumer could reasonably have avoided.

102.    Defendant engaged in *abusive* practices by: obscuring important characteristics of its financial product; and leveraging circumstances—including gaps in understanding, unequal bargaining power, and consumer reliance—to gain unreasonable advantage and cause injury.

103.    Defendant's acts and omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

104.    As described herein, Plaintiffs sustained injury or loss as a proximate result of Defendant's conduct.

105.    As a direct and proximate result of these practices, Plaintiffs and the members of the class have been damaged, and are entitled to recover actual damages to the extent permitted by law, in an amount to be proven at trial.

106.    Plaintiff and class members also seek appropriate equitable relief, including an order requiring Defendant to adequately disclose and end its unfair, abusive, and deceptive trade practices.

107.    Plaintiff and the class also seek damages, attorneys' fees, costs, and any other just and proper relief available under the CPA. *Id.* § 13-408.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

14

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.    An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b.    An order awarding actual, statutory, treble, and all other damages available by law, along with pre and post-judgment interest;

c.    An order requiring Defendant to repay all amounts associated with any cash advance made to any Maryland resident in the past twelve years;

d.    An order prohibiting the collection or receipt of any amounts on any cash advances that remain unpaid;

e.    An order awarding attorneys' fees and costs;

f.    An order declaring Defendant's conduct unlawful; and

g.    An order awarding all other relief that is just, equitable, and appropriate.

Respectfully Submitted,

Dated: December 15, 2023                By:   */s/ Jason S. Rathod*
                                              Jason S. Rathod
                                              **Migliaccio & Rathod LLP**
                                              412 H St NE
                                              Washington DC 20002
                                              Tel: (202) 470-3520
                                              jrathod@classlawdc.com

                                              Kevin Abramowicz (to be admitted)
                                              Kevin Tucker (to be admitted)
                                              Chandler Steiger (to be admitted)
                                              Stephanie Moore (to be admitted)
                                              **East End Trial Group LLC**
                                              6901 Lynn Way, Suite 215
                                              Pittsburgh, PA 15208
                                              Tel: (412) 223-5740
                                              Fax: (412) 626-7101
                                              kabramowicz@eastendtrialgroup.com
                                              ktucker@eastendtrialgroup.com
                                              csteiger@eastendtrialgroup.com
                                              smoore@eastendtrialgroup.com

                                              *Attorneys for Plaintiffs*